[No. C049928. Third Dist. Mar. 6, 2006.]

CALIFORNIA ASSOCIATION OF PROFESSIONAL SCIENTISTS,
Plaintiff and Appellant, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and
Respondents;
PUBLIC EMPLOYMENT RELATIONS BOARD, Movant and Appellant.

**COUNSEL**

Gerald James for Plaintiff and Appellant.

Robert Thompson and Tammy Samsel for Movant and Appellant.

Bill Lockyer, Attorney General, Louis R. Mauro, Assistant Attorney General, Catherine M. Van Aken and Michelle Mitchell Lopez, Deputy Attorneys General, for Defendant and Respondent Governor Arnold Schwarzenegger.

K. William Curtis, Warren C. Stracener, Patricia M. Keegan and Jennifer M. Garten for Defendants and Respondents Department of Personnel Administration and Michael Navarro, Director.

## OPINION

**ROBIE, J.**—In 2004, the Legislature passed, and the Governor signed, a bill creating an alternate retirement program that applies to certain new state employees during their first two years of employment. In this mandamus action, the California Association of Professional Scientists (CAPS) challenged the law as it applies to new employees in the bargaining unit that CAPS represents (bargaining unit 10), contending the law impermissibly impairs the pension rights of those employees as secured by the collective bargaining agreement between CAPS and the state.

The trial court concluded the operative provision in the collective bargaining agreement was merely a statement of existing law, not a bargained-for provision, and in any event there was no impairment of vested contractual pension rights. Accordingly, the trial court denied CAPS's mandamus petition. CAPS challenges that ruling on appeal.

While the case was under submission to the trial court, the Public Employment Relations Board (the Board) sought to intervene, claiming it had exclusive jurisdiction over the matter. The trial court denied the Board's application, and the Board challenges that ruling on appeal.

We conclude the trial court did not abuse its discretion in denying the Board's application to intervene in the case because the issue raised by CAPS's complaint is not within the Board's exclusive jurisdiction. We further conclude the trial court correctly denied CAPS's petition because the collective bargaining agreement between CAPS and the state did not include a promise not to change the pension rights of future employees in bargaining unit 10 and therefore the new law establishing the alternate retirement program did not impair any vested contractual rights. Accordingly, we will affirm.

### FACTUAL AND PROCEDURAL HISTORY

Before confronting the factual and procedural history of this case, we review some basic facts about public employment pension rights in California.

■ "As a general rule, the terms and conditions of public employment are controlled by statute or ordinance rather than by contract. [Citation.] However, ' "public employment gives rise to certain obligations which are protected by the contract clause of the Constitution . . . ." ' [Citation.] Such obligations include pension rights." (*San Bernardino Public Employees Assn. v. City of Fontana* (1998) 67 Cal.App.4th 1215, 1221 [79 Cal.Rptr.2d

634].) "By entering public service an employee obtains a vested contractual right to earn a pension on terms substantially equivalent to those then offered by the employer." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 325 [182 Cal.Rptr. 506, 644 P.2d 192].)

"The Public Employees' Retirement Law (Gov. Code, § 20000 et seq.)[1] establishes a retirement system for certain state and local government employees." (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 466 [14 Cal.Rptr.2d 514, 841 P.2d 1034].) A state employee generally becomes a member of the Public Employees' Retirement System (the system or CalPERS) "upon his or her entry into employment." (§ 20281; see § 20058.) Members of CalPERS are divided into various classifications, one of which is "state miscellaneous." (§ 20370, subd. (b)(1).) With those basic facts in mind, we turn to this case.

CAPS is the exclusive collective bargaining representative of the state employees in bargaining unit 10. In 2003, CAPS and the state (through the Department of Personnel Administration; hereafter the Department) entered into an agreement, or memorandum of understanding (MOU), covering the employees in bargaining unit 10, effective from July 1, 2003, through July 1, 2006 (hereafter the agreement). The provisions of the agreement requiring the expenditure of funds were subsequently approved by the Legislature. (Stats. 2003, ch. 615, § 2.)

Article 8 of the agreement between the state and CAPS deals with the issue of retirement. Section 8.3 of the agreement provides that "CAPS and the state agree to participate in the Second-Tier Retirement Plan as prescribed by law."[2] Section 8.8 of the agreement more specifically addresses the election of first and second tier benefits for the employees in bargaining unit 10. That section provides:

"A. Employees currently in the Second Tier retirement plan may elect, pursuant to Government Code [section] 21073.7, to be covered under the first tier, as described in this article.

"B. Pursuant to Government Code [section] 21073.1, an employee in the Second Tier may exercise the Tier 1 right of election at any time after January

---

[1] "Unless otherwise indicated, all further statutory references are to the Government Code."

[2] As relevant here, at the time the parties entered into the agreement the Public Employees' Retirement Law provided generally for two types of retirement benefits for state miscellaneous members—first tier benefits and second tier benefits. First tier benefits are based on years of service and contributions made by both the employee and the employer. (See §§ 21354.1, 21073.7, subd. (a).) Second tier benefits, on the other hand, are based only on years of service and contributions by the employer; no contributions by the employee are required. (See §§ 21076, 20677.4, subd. (c).)

1, 2000. An employee who makes this election is eligible to purchase past Second Tier service, over a period of time up to 180 months (15 years), and purchase partial amounts of service. Employees who purchase past service are required to pay the amount of contributions they would have paid had they been first tier members during the period of service that they are purchasing. As required by CalPERS law, the amount will then include interest at 6 percent, annually compounded.

"C. Pursuant to Government Code [section] 21070.5, New employees who meet the criteria for CalPERS membership would be enrolled in the First Tier plan and have the right to be covered under the Second Tier plan within 180 days of the date of their appointment. If a new employee does not make an election for Second Tier coverage during this period, he/she shall remain in the First Tier plan."

On August 11, 2004, the Governor signed into law Senate Bill No. 1105 (2003–2004 Reg. Sess.), which amended various provisions and created new provisions of the Public Employees' Retirement Law, effective immediately.[3] (Stats. 2004, ch. 214.) Bill No. 1105 created "an alternate retirement program" for new state miscellaneous members of CalPERS first employed by the state on or after the effective date of the law. (§ 19999.3, subd. (a); see § 20281.5, subd. (a).) Under this new program, these new employees do "not accrue credit for service in the system and [do] not make employee contributions to the system . . . for employment with the state until the first day of the first pay period commencing 24 months after becoming a member of the system." (§ 20281.5, subd. (b).) Instead, during their first two years of state employment, these new employees contribute to a defined contribution retirement plan. (§ 19999.3, subds. (b), (c).) After 46 months of employment (and until the end of their 49th month of employment), these employees can elect to receive credit in CalPERS for their first two years of employment by transferring the accumulated contributions in the defined contribution retirement plan into CalPERS. (§ 20908.)

As part of this change to the Public Employees' Retirement Law, a new subdivision (e) was added to section 21070.5. (Stats. 2004, ch. 214, § 11.) That subdivision provides that "[f]or a member subject to Section 20281.5 [i.e., the alternate retirement program], the 180-day election period [for electing to be subject to second tier benefits rather than first tier benefits] shall not commence until the first day of the first pay period commencing 24 months after becoming a member of the system." (§ 21070.5, subd. (e).)

In October 2004, CAPS commenced this action by filing a petition for writ of mandate and a complaint for declaratory relief challenging the application of

---

[3] Hereafter, we will refer to this new law generally as Bill No. 1105.

the alternate retirement program to new employees in bargaining unit 10. CAPS claimed Bill No. 1105 expressly conflicted with and improperly impaired the rights granted new employees under section 8.8(C) of the agreement and sought a declaration that the new law could not be applied to new employees in bargaining unit 10. CAPS also sought a writ commanding the Governor, the Department, and the Department's director to stop placing new employees in bargaining unit 10 in the alternate retirement program and to retroactively place all employees improperly placed in the alternate retirement program into CalPERS's first tier plan.

In an apparent effort to fend off any argument that the court lacked jurisdiction over the case, CAPS contended that while application of the new law to new employees in bargaining unit 10 "arguably [constitutes] an unfair labor practice (unilateral change in terms and conditions of employment on a matter within the scope of negotiations)," the Board does not have "the authority or power to resolve this instant dispute" because the Board does not have the authority to enforce the agreement and therefore cannot grant "the relief sought in this action—the restoration of the bargained for contractual right to participation in the First Tier retirement plan or election of participation in the Second Tier retirement plan for all new state Bargaining Unit 10 employees."

The Governor and the Department opposed CAPS's petition, but did not argue that the court lacked jurisdiction. Following a hearing on February 18, 2005, the court took the matter under submission.

On March 22, 2005, while the case was still under submission, the Board applied to intervene in the case. The Board asserted that it has exclusive initial jurisdiction over all matters that arguably allege violations of the Ralph C. Dills Act (§ 3512 et seq.) (hereafter the Dills Act) and that implementation of the alternate retirement program arguably violates that law. The Board sought to file a complaint in intervention requesting dismissal of the action for lack of jurisdiction. All of the parties opposed the Board's application to intervene.

On March 30, 2005, the trial court denied the Board's application, finding "that [the Board] does not have a sufficiently direct interest in this case to warrant intervention, that its proposed complaint in intervention would enlarge the issues in the case, and that the reasons for intervention do not outweigh the opposition by the parties presently in the action."

On the same day, the trial court issued its ruling on CAPS's petition. According to the court, CAPS failed to show "that the referenced statement in Article 8.8 of the [agreement] is actually a bargained-for provision as

opposed to a statement of the then existing law." The court further concluded that "there was no impairment of vested contractual rights" because the new law affected only new employees and the pension rights of those employees "did not arise under the prior statutes or the [agreement] itself; they arose under the statutes as they existed at the time they accepted employment with the state."

Consistent with its ruling, in June 2005, the court entered a judgment denying CAPS's writ petition and declaring "that the Alternate Retirement Program mandated by Bill No. 1105, chapter No. 214 of the Statutes of 2004, applied to new employees in state Bargaining Unit 10 who are covered by the Memorandum of Understanding between the State of California and the California Association of Professional Scientists, does not impair vested contractual rights in violation of the Federal and State Constitutions."

CAPS filed a timely notice of appeal from the judgment. In the meantime, the Board had already filed a timely notice of appeal from the order denying its application to intervene.

DISCUSSION

I

*The Board's Appeal*

The Board contends the trial court abused its discretion in denying the Board's application to intervene in the case. We disagree.

"Code of Civil Procedure section 387 sets forth the rules for intervention by a third party in existing litigation. Section 387, subdivision (a) states in relevant part: 'Upon timely application, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both, may intervene in the action or proceeding.' Section 387, subdivision (b) provides that 'if the person seeking intervention claims an interest relating to the property or transaction which is the subject of the action and that person is so situated that the disposition of the action may as a practical matter impair or impede the person's ability to protect that interest, unless that person's interest is adequately represented by existing parties, the court shall, upon timely application, permit that person to intervene.'

"Pursuant to section 387 the trial court has discretion to permit a non-party to intervene where the following factors are met: (1) the proper procedures have been followed; (2) the nonparty has a direct and immediate interest in the action; (3) the intervention will not enlarge the issues in the

litigation; and (4) the reasons for the intervention outweigh any opposition by the parties presently in the action. [Citation. ] This court reviews an order denying leave to intervene under the abuse of discretion standard." (*Reliance Ins. Co. v. Superior Court* (2000) 84 Cal.App.4th 383, 386 [100 Cal.Rptr.2d 807].)

We begin (and as it turns out, end) our analysis of the Board's appeal with the question of whether the trial court abused its discretion in finding the Board "does not have a sufficiently direct interest in this case to warrant intervention."

■ The interest the Board seeks to assert here is its interest in protecting its own exclusive initial jurisdiction over alleged violations of the Dills Act. Thus, we start with a brief explanation of that law. Enacted in 1977, the Dills Act (formerly known as the State Employer-Employee Relations Act or SEERA) "accords collective bargaining rights to state civil service employees." (*Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 605, fn. 3 [224 Cal.Rptr. 631, 715 P.2d 590]; see *White v. Davis* (2003) 30 Cal.4th 528, 572 [133 Cal.Rptr.2d 648, 68 P.3d 74]; *Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 175 [6 Cal.Rptr.2d 714].) "Under the Dills Act, the parties may negotiate over 'wages, hours, and other terms and conditions of employment,' except the 'merits, necessity, or organization of any service or activity provided by law or executive order' . . . . (§§ 3516, 3517.6.)" (*Department of Personnel Administration*, at p. 176.)

■ The Dills Act also "vests broad jurisdiction in [the Board] to investigate and act upon unfair labor charges and alleged violations of the act." (*Sullivan v. State Bd. of Control* (1985) 176 Cal.App.3d 1059, 1064 [225 Cal.Rptr. 454].) To this end, subdivision (a) of section 3514.5 provides that "[a]ny employee, employee organization, or employer shall have the right to file an unfair practice charge" with the Board, and subdivision (c) of that statute provides that the Board "shall have the power to issue a decision and order directing an offending party to cease and desist from the unfair practice and to take such affirmative action, including but not limited to the reinstatement of employees with or without back pay, as will effectuate the policies of this chapter." More importantly, section 3514.5 provides that "[t]he initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of the board." Any party "aggrieved by a final decision or order of the board in an unfair practice case, except a decision of the board not to issue a complaint in such a case" can obtain judicial review of the Board's decision by filing a petition for writ relief. (§ 3520, subd. (b).)

■ "The assignment of exclusive initial jurisdiction in section 3514.5 to the Board means that the only forum to pursue a cause of action for violation of the statutory rights conferred in the Dills Act is before the Board." (*Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1826, fn. 9 [17 Cal.Rptr.2d 323].)

Here, the Board contends CAPS's complaint alleges conduct by the state that arguably violated two provisions of the Dills Act in that "the State employer unilaterally changed employee retirement provisions without giving the employees' representative, CAPS, notice or an opportunity to request bargaining over the proposed changes."[4] According to the Board, it "attempted to intervene in the superior court case to protect its right and obligation to determine in the first instance whether such conduct violated the Dills Act."

■ The Board's claim that it has a direct and immediate interest in this case because it has the exclusive initial jurisdiction to act on alleged violations of the Dills Act misapprehends the gravamen of CAPS's complaint here. The gravamen of CAPS's complaint is *not* that the state committed an unfair labor practice in violation of the Dills Act by unilaterally changing employee retirement provisions without notice to CAPS. Rather, the gravamen of CAPS's complaint is that Bill No. 1105, as applied to employees in bargaining unit 10, impermissibly conflicts with the terms of the agreement and therefore violates the state and federal constitutional prohibitions against impairing the obligations of contracts.[5] This issue is not within the scope of the Board's exclusive jurisdiction under section 3514.5; rather, it is an issue for the judiciary. (See, e.g., *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1].) Even if we assume for the sake of argument that the state had an obligation under the Dills Act to give CAPS notice and an opportunity to request collective bargaining before enacting the new alternate retirement program, and failed to fulfill that obligation, that would not transform this case into an unfair labor practice case. The constitutional issue CAPS seeks to

---

[4] The two provisions on which the Board relies are section 3516.5 and subdivision (c) of section 3519. The former provision provides in relevant part that "[e]xcept in cases of emergency as provided in this section, the employer shall give reasonable written notice to each recognized employee organization affected by any law . . . directly relating to matters within the scope of representation proposed to be adopted by the employer, and shall give such recognized employee organizations the opportunity to meet and confer with the administrative officials or their delegated representatives as may be properly designated by law." The latter provision provides that it is unlawful for the state to "[r]efuse or fail to meet and confer in good faith with a recognized employee organization."

[5] "The contract clause of the federal Constitution (art. I, § 10) prohibits any state from passing a law 'impairing the obligations of contracts.' " (*Lyon v. Flournoy* (1969) 271 Cal.App.2d 774, 779 [76 Cal.Rptr. 869].) The California Constitution similarly provides that "[a] . . . law impairing the obligation of contracts may not be passed." (Cal. Const., art. I, § 9.)

litigate here is separate and distinct from any issue of whether the state violated its collective bargaining obligations under the Dills Act.

Since the issue raised by CAPS's complaint is not within the Board's exclusive jurisdiction, the Board has no direct or immediate interest in this action, and thus the trial court correctly denied the Board's application to intervene.

## II

### *CAPS's Appeal*

CAPS contends Bill No. 1105 impermissibly impaired the contractual rights of bargaining unit 10's new employees by delaying for two years their right to participate in the system—a right guaranteed by section 8.8(C) of the agreement. We disagree.

## A

### *Standard of Review*

CAPS and the Department agree the applicable standard of review is de novo because, as CAPS puts it, "[t]he interpretation of the [agreement] and the new law added by SB 1105 present pure questions of law." On behalf of the Governor, the Attorney General agrees de novo review is appropriate "[t]o the extent the trial court made pure determinations of law." The Attorney General contends, however, that the more deferential substantial evidence standard of review applies "to the extent the trial court made findings of fact" "such as the finding that CAPS made no showing that Article 8.8, subsection C, of the MOU was a bargained-for promise instead of a mere recitation of then-existing law."

The Attorney General's attempt to invoke the substantial evidence standard of review is misplaced. "It is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence." (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723].) Here, the Attorney General does not point to any extrinsic evidence relevant to the interpretation of section 8.8(C) of the agreement. Thus, the interpretation of that provision is a question of law subject to de novo review, as are all other questions raised by CAPS's appeal.

B

*Pension Rights and the Impairment of Contracts*

■ "[B]oth the federal and state contract clauses protect the vested pension rights of public officers and employees from unreasonable impairment." (*Legislature v. Eu* (1991) 54 Cal.3d 492, 528 [286 Cal.Rptr. 283, 816 P.2d 1309].) "While some jurisdictions view public employees' retirement rights as a gratuity, California is firmly committed to the proposition that these rights are contractual; that they are 'vested' in the sense that the lawmakers' power to alter them after they have been earned is quite limited." (*Lyon v. Flournoy, supra,* 271 Cal.App.2d at p. 779.) As we have noted already, "By entering public service an employee obtains a vested contractual right to earn a pension on terms substantially equivalent to those then offered by the employer." (*Carman v. Alvord, supra,* 31 Cal.3d at p. 325.)

Here, the change in pension rights about which CAPS complains did not apply to persons who were already employed by the state when Bill No. 1105 took effect; rather, the change applied only to *prospective* employees. At first glance, this distinction appears significant, because generally "[t]he contractual basis of a pension right is the exchange of an employee's services for the pension right offered by the statute" and thus " '[f]uture employees do not have a vested right in any particular pension plan.' " (*Claypool v. Wilson* (1992) 4 Cal.App.4th 646, 662, 670 [6 Cal.Rptr.2d 77].)

The foregoing authorities, however, do not speak to the situation where a collective bargaining agreement exists. When a collective bargaining agreement purports to secure pension rights for future employees, it may well be that the federal and state contract clauses protect the rights of future employees as much as the rights of existing employees. We need not decide that issue, however, because we conclude section 8.8(C) of the agreement did not promise to leave unchanged the pension rights of future employees in bargaining unit 10.

C

*Imposition of Section 8.8(C) of the Agreement*

■ "A promise not to change the character of a pension program as to new employees is a fundamental constraint on the freedom of action of the Legislature." (*Claypool v. Wilson, supra,* 4 Cal.App.4th at p. 670.) Accordingly, we will not interpret a collective bargaining agreement as containing such a promise unless we have no other reasonable choice. As the United States Supreme Court has explained in a different context, "sovereign

power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." (*Merrion v. Jicarilla Apache Tribe* (1982) 455 U.S. 130, 148 [102 S.Ct. 894, 71 L.Ed.2d 21, 36].)

On its face, section 8.8(C) of the agreement does not suggest the state was bargaining away its sovereign right to change the character of pension rights for future employees. The section provides only that "[p]ursuant to Government Code [section] 21070.5, New employees who meet the criteria for CalPERS membership would be enrolled in the First Tier plan and have the right to be covered under the Second Tier plan within 180 days of the date of their appointment. If a new employee does not make an election for second tier coverage during this period, he/she shall remain in the First Tier plan." Nothing in this provision clearly abdicates the legislative power to make changes in the pension system for prospective employees.

In its opening brief, CAPS suggests section 8.8(C) of the agreement must constitute a promise not to change the character of pension rights as to new employees, otherwise "there would be no need to place this provision in the MOU at all." Stated another way, CAPS suggests section 8.8(C) of the agreement is either a binding promise not to change the pension rights of future employees or an unnecessary restatement of existing law. CAPS contends that "[u]nless there is something in the contract to indicate otherwise," a contractual provision should not be treated as simply "a restatement of then existing law."

In its reply brief, however, CAPS unwittingly identifies the reason why section 8.8(C) of the agreement appears in the agreement, and when this reason is understood, it becomes apparent that section 8.8(C) of the agreement is more than simply a restatement of existing law, but at the same time something less than a promise not to change the pension rights of future employees.

As CAPS points out, in 1999 the Legislature added various provisions to the Public Employees' Retirement Law. (Stats. 1999, ch. 555.) These provisions included sections 21070.5, 21073.1, and 21073.7. (Stats. 1999, ch. 555, §§ 17, 22, 24.) Under section 21070.5, a person who became a state miscellaneous member of the system on or after January 1, 2000, because the person was first employed by the state on or after that date would be subject to first tier benefits unless the person elected within 180 days of employment to be subject to second tier benefits.[6] (§ 21070.5, subd. (a).) Under

---

[6] Although a request for judicial notice was unnecessary, at the Department's request, we take judicial notice of the fact that section 21070.5 was enacted in 1999 and first amended in 2000, before the parties entered into the agreement.

section 21073.7, a member of the system subject to second tier benefits employed after January 1, 2000, would be allowed to make an irrevocable election to be subject to first tier benefits. (§ 21073.7, subd. (a).) Once such an election was made, the member could also irrevocably elect to have past service under the second tier credited under the first tier by making certain contributions specified in section 21073.1. (§ 21073.7, subd. (b).)

These three new provisions of the Public Employees' Retirement Law were *not* automatically effective with respect to employees in bargaining units. Each of these provisions expressly provided that it was "subject to the limitations set forth in Section 21251.13." (§§ 21070.5, subd. (d), 21073.1, subd. (c), 21073.7, subd. (d).) Section 21251.13, subdivision (a)(2) in turn provided that "[n]otwithstanding any other provision of law, Sections 21070.5, . . . 21073.1, [and] 21073.7," "[s]hall not apply to a state employee . . . in a bargaining unit unless and until incorporated in a memorandum of understanding . . . applicable to that bargaining unit."

These provisions provide the explanation for section 8.8 of the agreement between the state and CAPS. In light of the 1999 legislation, the three provisions in section 8.8 clearly are not simply restatements of existing law. Instead, they represent the incorporation of sections 21070.5, 21073.1, and 21073.7 into the MOU between the state and the employees in bargaining unit 10, *which was necessary to make those statutory provisions applicable to bargaining unit 10 employees.* After the incorporation of sections 21073.1 and 21073.7 into the agreement, existing bargaining unit 10 employees subject to second tier benefits could irrevocably elect to be subject to first tier benefits and could irrevocably elect to have past service under the second tier credited under the first tier by making the required contributions. Similarly, after the incorporation of section 21070.5 into the agreement, bargaining unit 10's new employees would be subject to first tier benefits unless they elected within 180 days of employment to be subject to second tier benefits.

 The pension rights provided to new employees by the incorporation of section 21070.5 into the agreement are no different than any other pension rights for state employees—they "vest" upon the acceptance of employment. In other words, so long as the Legislature made no further changes to the law, bargaining unit 10's new employees had a right to first tier benefits unless they elected within 180 days of employment to be subject to second tier benefits. There is nothing in the agreement, however, that restricts the Legislature from making further changes to the Public Employees' Retirement Law that apply only to prospective employees, which is what the Legislature did when it enacted Bill No. 1105 in 2004. The agreement's incorporation of section 21070.5 (section 8.8(C) of the agreement) did not commit the Legislature to maintaining the same rights for all prospective bargaining unit

10 employees throughout the effective period of the agreement. Accordingly, Bill No. 1105 did not impair any vested contractual rights, and the trial court properly denied CAPS's mandamus petition.

## DISPOSITION

The order denying the Board's application to intervene and the judgment in favor of the Department and the Governor are affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a)(1).)

Nicholson, Acting P. J., and Morrison, J., concurred.

The petition of appellant California Association of Professional Scientists for review by the Supreme Court was denied May 24, 2006, S142606.